2022 IL App (1st) 201112

FIRST DISTRICT
THIRD DIVISION
March 30, 2022

No. 1-20-1112

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 12045 |
| | ) | |
| CARL HEMPHILL, | ) | Honorable |
| | ) | Thomas J. Hennelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Ellis concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Carl Hemphill appeals the trial court's denial of his motion for leave to file his

*pro se* successive postconviction petition. He argues on appeal that, as a 21-year-old, his 40-year

sentence is an unconstitutional *de facto* life sentence under both the eighth amendment to the

United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of

the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Based on emerging authority regarding

youthful offenders and his unconstitutional sentence, defendant asserts that he satisfied the

requisite cause and prejudice for filing a successive postconviction petition and that the trial

court erred in denying his motion.

¶ 2    Following a bench trial, defendant was convicted of first degree murder, aggravated

kidnapping, armed robbery, and attempted armed robbery and was sentenced to concurrent

prison terms of 40 years for the murder and 10 years each for the other convictions. Since

defendant is not challenging his conviction, we detail the trial evidence only as necessary for the resolution of the issues raised on appeal.

¶ 3 The offenses arose out of an April 1999 incident in which defendant and his two codefendants Troy Ballard and Toussaint Daniels devised a plan to rob the victim Terry Sales, a known drug dealer. Upon meeting with Sales, defendant held him at gunpoint while Ballard searched Sales's pockets. Defendant and Ballard were wearing face masks.

¶ 4 Finding no drugs or valuables, defendant and Ballard forced Sales into the trunk of Sales's vehicle. After driving Sales's car for some time, defendant and his codefendant pulled over, and Ballard demanded that Sales turn over his cell phone for fear he might call the police. Later, the men stopped again, ordered Sales out of the trunk, and returned his car keys. When Sales cursed at defendant and demanded the return of his phone, defendant shot and killed him. Defendant then fled the scene in Sales's vehicle. Defendant then went to see the film "The Matrix" at the Ford City shopping center. While there, he lost the keys to Sales's car. The following day, defendant and Ballard returned to Ford City and burned Sales's vehicle in the parking lot because it had their fingerprints on it.

¶ 5 After his arrest, defendant provided a court-reported statement to an assistant state's attorney in which he admitted to the robbery, kidnapping, and murder of Sales. In his statement, defendant admitted that he previously gave Sales $500 to purchase drugs. Sales left to get the drugs, never returned, and stole defendant's money. Defendant stated that, when Sales was cursing at him, his temper "built up" and he thought about the money Sales had stolen from him. Defendant was "very angry," and he shot Sales multiple times.

¶ 6 At sentencing, the trial court heard evidence in aggravation and mitigation. Defendant's presentence investigation (PSI) disclosed that he was 21 years old at the time of the offenses and

was a member of the Vice Lords street gang until 2002. He had one prior conviction for criminal trespass to a vehicle in 1997, for which he received 24 months' probation, which he subsequently violated. Defendant was "kicked out" of high school after three years and hoped to earn his general equivalency diploma (GED).

¶ 7    Defendant's mother and grandmother testified in mitigation about defendant's childhood, including his prescribed use of Ritalin and placement in special education classes. His grandmother testified that defendant fell from the third floor when he was a baby and the fall "sort of [took] something away from him." His mother testified that she has multiple sclerosis and defendant was "always there" for her. She also discussed how defendant fell at age two and had a concussion. He was prescribed Ritalin from first grade through high school. Defendant left school his junior year. She stated that defendant did not have a discipline problem at home and showed respect toward her and other family members.

¶ 8    In his allocution, defendant admitted his plan was to rob Sales and he told Sales he could go. He had no intention of killing him. He stated, "I was young, I was stupid, I was out there, I know what I [was] supposed to have been doing but I wasn't doing it." He further stated that he grew up during the four years he was in jail and was "very sorry" for what happened and asked the court for mercy for him and for the Sales family.

¶ 9    Following arguments, the court detailed its findings.

> "That's one thing about a murder, Mr. Hemphill. After it's said and done, it's easy for the person charged with the murder to say he's young and he's stupid and have mercy. Doesn't bring the victim back. Doesn't bring the victim back at all. There's nothing that I can give, I'm going to do here today that is going to bring the victim in this case back to his family. It's a fundamental lesson.

3

You heard your grandmother talk about you should have been in church, you heard your mother if you were in school, this would not have happened. I imagine as they were saying that that in both places if you were listening, that you would have learned not to take anyone's life. It's just simple. You had no right to take it. Just as if the property wasn't yours, you weren't supposed to take that either. That's how this all started.

If you look at your statement and if you look at the evidence and I have gone over your statement. Numerous times. As late as last night. This started out as the armed robbery of a dope dealer. This individual was lured to your home [while] your mother was at work. According to your statement. Numerous phone calls were made to get him to come over to your house. Once he arrived there, according to your statement a gun was held on him. That he had no money, that you all went through his pockets, that you and your co-offenders according to your statement went through the pockets, nothing was found.

At that time, it popped in your head my mom's coming home, we have got to move him. why not let him go, if he didn't have anything. But then you formulated another plan. Put him in the trunk of his car. At gunpoint. Take him away. Then according to your statement, it dawned on you, modern technology, he might have a cell, phone. Car stopped at gunpoint, the—his telephone is taken from him. According to your statement you drive a little further and yeah, it was that point in time that you were going to let him go.

But according again to your statement, it was one on one. One on one between you and the victim. Terry Sales. And apparently Mr. Sales seeing it was

one on one decided to confront you about where his cell phone was and why this was going on. And brought up bad memories as you told the authorities that he had taken you for some money. About a year ago. And that's when you decided to kill him."

¶ 10　The court then sentenced defendant to a term of 40 years for first degree murder and separate 10-year terms for aggravated kidnapping, robbery, and attempted armed robbery, to be served concurrently. The court declined to impose consecutive sentences because it found that defendant's "criminal objective was constantly changing from the time of the armed robbery which resulted in attempt armed robbery, up until the murder and then the arson."

¶ 11　This court affirmed defendant's convictions and sentences on direct appeal. See *People v. Hemphill*, No. 1-03-0895 (2005) (unpublished order under Illinois Supreme Court Rule 23).

¶ 12　Defendant subsequently filed multiple collateral attacks against his convictions. See *People v. Hemphill*, No. 1-06-3481 (2010) (unpublished order under Illinois Supreme Court Rule 23) (affirming the summary dismissal of defendant's 2006 *pro se* postconviction petition); *People v. Hemphill*, 2013 IL App (1st) 110654-U (affirming trial court's denial of leave to file successive postconviction petition); *People v. Hemphill*, 2017 IL App (1st) 162017-U (affirming the trial court's dismissal of defendant's "petition of mandamus" seeking relief under the Freedom of Information Act); *People v. Hemphill*, No. 162840 (2018) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (granting appointed appellate counsel's motion for leave to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirming the circuit court's denial of defendant's 2016 motion for leave to file his second successive postconviction petition).

¶ 13   In September 2017, defendant filed his *pro se* successive postconviction petition arguing that his 40-year sentence was a *de facto* life sentence in violation of both the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 21 years old at the time of the offenses. Defendant argued that he established the requisite cause and prejudice necessary to file his successive petition because the emerging authority involving youthful offenders did not exist at the time of his prior postconviction petitions and he received an unconstitutional *de facto* life sentence. In support of his petition, defendant attached documents discussing research on brain development of youthful offenders and their capacity for reform and rehabilitation.

¶ 14   In April 2019, defendant filed a petition to supplement his successive postconviction petition with additional exhibits concerning his requests for medical records related to a head injury as a child and any medication he received, including Ritalin, as well as his records from the Chicago Public Schools. Defendant's school record indicated "LD" under the "Special Ed" classification but did not contain any additional information, and a handwritten notation stated this was all the information available in the records. An affidavit from defendant's mother stated that defendant suffered a concussion from a fall at age two. She also stated that defendant was prescribed Ritalin and had a learning disability throughout his school years.

¶ 15   Also in April 2019, defendant filed a motion to amend his successive petition to correct errors in his initial petition that he was raising an "as applied" constitutional violation of his sentence. He reiterated that he established cause because Illinois courts only recently acknowledged that young adult offenders were entitled to the same considerations as juveniles before imposing a *de facto* life sentence. Defendant maintained that he was prejudiced by his

claimed error when he received a *de facto* life sentence in violation of the United States Constitution and the Illinois Constitution.

¶ 16    In September 2020, the trial court denied defendant leave to file his successive petition in open court. The court observed that, since defendant was 21 years old at the time of the offenses, he was not a juvenile and was an adult.

¶ 17    This appeal followed.

¶ 18    On appeal, defendant argues that the trial court erred in denying him leave to file his successive postconviction petition. He contends that he satisfied the cause and prejudice test because the sentencing standards have changed for youthful offenders since his original postconviction petition was filed in 2006. Based on these changes in case law, defendant asserts that his 40-year sentence violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution because the trial court did not consider the mitigating effects of his youth since he was 21 years old at the time of the offenses.

¶ 19    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1(a)(1) (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Only one postconviction proceeding is contemplated under the Post-Conviction Act (*People v. Edwards*, 2012 IL 111711, ¶ 22), and a defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). The bar against successive postconviction proceedings should not be relaxed unless (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception.

7

*Edwards*, 2012 IL 111711, ¶¶ 22-23; *People v. Smith*, 2014 IL 115946, ¶ 30.

¶ 20    Under the cause and prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). The cause-and-prejudice standard is higher than the normal first-stage "frivolous or patently without merit" standard applied to initial petitions. See *id.* ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 35.

> "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35.

¶ 21    "A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *People v. Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2010)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. A defendant shows prejudice by demonstrating that the claim so infected the trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48. It is defendant's burden to establish a *prima facie* showing of both cause and prejudice in order to be granted leave before further proceedings on his claims can follow. See *People v. Bailey*, 2017 IL 121450, ¶ 24.

¶ 22    The sentencing of juvenile and youthful offenders has been evolving in the country over the last several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States

Supreme Court weighed in and set forth new constitutional parameters for the sentencing of juvenile offenders. See also *Graham v. Florida*, 560 U.S. 48, 68 (2010); *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012); *Montgomery v. Louisiana*, 577 U.S. 190, 209-12 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*, 2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). "The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court barred mandatory life sentences for juveniles who commit murder." *Id. Miller* has since been held to apply retroactively. *Montgomery*, 577 U.S. at 212; see also *People v. Holman*, 2017 IL 120655, ¶ 38 (recognizing that *Miller* applied retroactively).

¶ 23     Since *Miller*, the Illinois Supreme Court has suggested similar sentencing challenges are viable for youthful offenders, *i.e.*, defendants who are young, but legal adults. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (finding that a 19-year-old defendant was not necessarily foreclosed from raising an as-applied challenge in the trial court and observing that the Post-Conviction Act was designed to resolve such constitutional claims); *People v. Harris*, 2018 IL 121932, ¶ 48 (concluding that the 18-year-old defendant's as-applied proportionate penalties challenge was "more appropriately raised" in a postconviction proceeding rather than on direct appeal).

¶ 24     We first address defendant's claim that his 40-year sentence violates the eighth amendment. Illinois courts have held that Miller protections under the eighth amendment are not implicated in the case of a defendant, aged 18 or over. See *Harris*, 2018 IL 121932, ¶¶ 54-61. The *Harris* court concluded that "for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *Id*. ¶ 61. Appellate panels have recognized and applied this

9

conclusion consistently. See *People v. Green*, 2022 IL App (1st) 200749, ¶ 29; *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 32; *People v. Handy*, 2019 IL App (1st) 170213, ¶ 37; *People v. Herring*, 2018 IL App (1st) 152067, ¶ 103; *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 31. Accordingly, defendant's challenge under the eighth amendment has been foreclosed.

¶ 25     Turning to the proportionate penalties claim, defendant argues that, because he received a *de facto* life sentence without any consideration of the mitigating effects of his youth, as a 21-year-old, he has a viable claim that his sentence violates the proportionate penalties clause. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Rizzo*, 2016 IL 118599, ¶ 28. Defendant's sentencing claim relies on the supreme court's decision in *People v. Buffer*, 2019 IL 122327. According to defendant, his 40-year sentence constitutes a *de facto* life sentence, and thus, he was entitled to consideration of his youth and its attendant circumstances under *Miller*.

¶ 26     However, the flaw in defendant's argument is a misapprehension of the holding in *Buffer*. In *Buffer*, the supreme court concluded that "a prison sentence of *40 years or less* imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." (Emphasis added.) *Id.* ¶ 41. As the court explained, "a prison sentence of *40 years or less* imposed on a juvenile offender provides " ' "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." ' " (Emphasis added.) *Id.* (quoting *Miller*, 567 U.S. at 479, quoting *Graham*, 560 U.S. at 75). Defendant's sentence in this case is 40 years. Since, under *Buffer*, a sentence of 40 years is not a *de facto* life sentence for a juvenile, it

10

follows that defendant's 40-year sentence as a 21-year-old likewise falls outside of *Miller* and its protections.

¶ 27    More recently, the Illinois Supreme Court reiterated its holding that a *de facto* life sentence is 40 years or more. *Dorsey*, 2021 IL 123010, ¶ 64. In that case, the supreme court considered whether the defendant's sentence was a *de facto* life sentence in violation of the eighth amendment when the applicable statutory good-conduct scheme provided the defendant some meaningful opportunity to obtain release after serving 40 years or less of incarceration. *Id.* In *Dorsey*, the defendant received an aggregate sentence of 76 years, but with good conduct credit, he had the opportunity for release after serving 38 years in prison. *Id.* ¶ 65. The supreme court then found that the defendant had not been sentenced to a *de facto* life sentence and, as a consequence, could not satisfy the prejudice prong of the cause-and-prejudice test for bringing a successive postconviction with respect to his eighth amendment claim. *Id.*; see also *People v. Ruddock*, 2022 IL App (1st) 173023, ¶¶ 65-66 (finding a 55-year sentence with good conduct credit is not a *de facto* life sentence).

¶ 28    In reaching its conclusion, the court reasoned:

> "Again, when this court set the mark at more than 40 years in *Buffer*, it relied upon the General Assembly's recent enactment of a minimum 40-year sentence for juveniles convicted of certain murders that would warrant a natural life sentence for an adult. That mandatory-minimum-sentencing scheme referred to in *Buffer* provides no opportunity for good-conduct credit, and *Buffer* is therefore fundamentally different from the present case. Thus, we find that the more-than-40-years mark in *Buffer* is meant to be the line for a *de facto* life sentence where there is no opportunity to demonstrate rehabilitation and obtain release short of

11

serving more than 40 years in prison. In other words, a judicially imposed sentence that is more than 40 years but offers day-for-day, good-conduct sentencing credit does not cross the *Buffer* line if it offers the opportunity to demonstrate maturity and obtain release with 40 years or less of incarceration."

*Dorsey*, 2021 IL 123010, ¶ 64.

¶ 29    While defendant in the instant case is not eligible for good conduct sentencing credit, the *Dorsey* court made clear that the dividing line for a *de facto* life sentence is more than 40 years. As discussed above, defendant's 40-year sentence does not constitute a *de facto* life sentence under *Buffer* and *Dorsey*.

¶ 30    We further point out that *Dorsey* also foreclosed defendant's proportionate penalties claim. *Id.* ¶ 74. The supreme court in *Dorsey* found that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *Id.* The supreme court observed as follows.

"Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.* (citing *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59).

¶ 31    It follows that, based on the supreme court's reasoning in *Dorsey*, defendant in this case cannot satisfy the cause prong of the cause-and-prejudice test for bringing a successive postconviction petition with respect to his proportionate penalties claim under the Illinois Constitution. See *Ruddock*, 2022 IL App (1st) 173023, ¶¶ 72-73 (finding the defendant could not establish cause under the cause and prejudice test for his proportionate penalties claim).

¶ 32    Moreover, even if defendant's 40-year sentence constituted a *de facto* life sentence, which we do not find, defendant has failed to demonstrate that he was entitled to *Miller* protections when he was 21 years old at the time of the offenses.

¶ 33    While defendant relies on several cases to support his *Miller* claim, nearly all involved proportionate penalties claims advanced by defendants who were 18 or 19 years old at the time they committed the offenses, rather than a 21-year-old. See *People v. Minniefield*, 2020 IL App (1st) 170541; *People v. Franklin*, 2020 IL App (1st) 171628; *People v. Johnson*, 2020 IL App (1st) 171362; *People v. Bland*, 2020 IL App (3d) 170705; *Ruiz*, 2020 IL App (1st) 163145; *People v. Ross*, 2020 IL App (1st) 171202.

¶ 34    Defendant does, however, cite one decision, *People v. Savage*, 2020 IL App (1st) 173135, in support of his claim that *Miller* can be applied to a young adult over 21. However, we find the circumstances in *Savage* distinguishable from the instant case. In that case, the defendant appealed the first stage dismissal of his initial postconviction petition. The reviewing court found that the 22-year-old defendant satisfied the lower gist standard where the defendant's factual allegations that his brain was more like that of a juvenile was supported by the record. *Id.* ¶¶ 72-76. In contrast, defendant here was required to satisfy the higher cause and prejudice test by detailing how his brain was more akin to that of a juvenile and to support his claim with sufficient documentation.

¶ 35    Several cases have addressed *Miller* claims by defendants aged 21 and over. In *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 1, the defendant filed a successive postconviction petition, alleging that his natural life sentence for crimes committed when he was 21 violated the proportionate penalties clause. The reviewing court similarly observed that the defendant could "point to no case in which an Illinois court has recognized that a life sentence imposed on a

13

young adult—21 or older as [the defendant] was—is unconstitutional as applied to that offender under the proportionate penalties clause." *Id.* ¶ 33. "The evolving science on brain development may support such claims at some time in the future, but for now individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *Id.* The *Humphrey* court reasoned:

"While 21 is undoubtedly somewhat arbitrary, drawing a line there is in keeping with other aspects of criminal law and society's current general recognition that 21 is considered the beginning of adulthood. In Illinois, a person under the age of 21 when he or she commits first degree murder is now eligible for parole review after serving 20 or more years of his or her sentence. 730 ILCS 5/5-4.5-115 (West Supp. 2019). The Illinois legislature has also prohibited the sale of nicotine and tobacco products to persons under 21 (720 ILCS 675/1 (West Supp. 2019)), prohibited the sale of alcohol products to persons under 21 (235 ILCS 5/6-16 (West 2016)), and made possession of a firearm by those under the age of 21 an aggravating factor for aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2016))." *Id.* ¶ 34.

¶ 36 The reviewing court further pointed out that, even if there was some basis for an individual aged 21 or older at the time of the offense to raise an as applied *Miller*-type claim under special circumstances, the defendant's circumstances would not satisfy that basis. The court noted that the defendant was an active participant in the crimes and had prior violent crimes and that he received a discretionary sentence, with the court finding he was beyond rehabilitation. *Id.* ¶ 35. The *Humphrey* court concluded that, "under the current state of the law,

14

[the defendant's] claim cannot meet the cause-and-prejudice standard for an as-applied challenge under either the eighth amendment or the proportionate penalties clause." *Id.* ¶ 36.

¶ 37    In *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 1, the defendant filed a successive postconviction petition seeking *Miller* protections for youthful offenders because he received a sentence of 55 years for first degree murder and armed robbery committed when he was 23. In reviewing the defendant's proportionate penalties claim, the *Rivera* court found that any arguments that could be made based on the statutes and cases relating to defendants under the age of 21 were not applicable. *Id.* ¶ 26. The court observed that the defendant's actions "set forth none of the immaturity or impetuosity that are the hallmarks of youth," noting his prior felony convictions for drug trafficking and gun possession, as well as that the commission of the crimes at issue occurred shortly after the defendant's release from prison. *Id.* The reviewing court concluded that, if an extension of *Miller* protections should be made for defendants over the age of 21, then it should be made by our legislature or our supreme court. *Id.* ¶ 27. "The supreme court and the legislature are in a better position to draw clear, predictable and uniform lines for our state." *Id.*; see also *People v. Kruger*, 2021 IL App (4th) 190687, ¶ 32 (agreeing with the *Humphrey* court's limitation of *Miller*-based claims to defendants 18 to 20 years old and any further extension should be made by either the legislature or the supreme court).

¶ 38    Similarly, in *People v. Suggs*, 2020 IL App (2d) 170632, ¶¶ 30-44, the reviewing court affirmed the summary dismissal at the first stage of an initial postconviction petition where the defendant, who was 23 years old at the time of his offense, raised eighth amendment and proportionate penalties challenges to his *de facto* life sentence. The *Suggs* court noted that, although "society has drawn lines at ages 18 and 21 for various purposes," the defendant failed to "point to any line, societal, legal, or penological, that is older than 21 years." *Id.* ¶ 35. The

reviewing court concluded while it may seem "but a short step" to apply the *Miller* factors to an 18-year-old offender, "it is a much greater leap to extend [them] to a 21-year-old, and an even greater leap to apply [them] to a 23-year-old," such as the defendant in that case. *Id.*

¶ 39  Recently, this court in *Green*, 2022 IL App (1st) 200749, considered the same argument advanced by defendant here. We reviewed *Humphrey*, *Rivera*, and *Suggs* along with the cases involving 18- and 19-year-old defendants. *Id.* ¶¶ 37-40. We also looked to the recent statutes enacted by the General Assembly regarding youthful offenders.

> "In addition to addressing the growing case law regarding youthful offenders, the legislature firmly established the line between a young adult offender entitled to sentencing protection and adult offenders. Section 5-4.5-115 of the Unified Code of Corrections created a parole review for offenders under the age of 21 at the time of the offense. See 730 ILCS 5/5-4.5-115 (West 2020). Under this statute, a person convicted of first degree murder is eligible for parole after serving only 20 years, if he or she was under 21 years old at the time of the offense and was sentenced after the law took effect. *Id.* § 5-4.5-115(b). Additionally, the Juvenile Court Act of 1987 defines a ' " '[m]inor' " ' as 'a person under the age of 21 years subject to this Act' (705 ILCS 405/1-3(10) (West 2018)), while an ' " '[a]dult' " means a person 21 years of age or older' (*id.* § 1-3(2)). Thus, under this statutory scheme, defendant was an adult at age 21. It is also worth noting that under the current sentencing requirements, the murder of a police officer mandates the imposition of a mandatory sentence of natural life without the possibility of parole for a defendant over the age of 18. See 730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2020); *id.* § 5-4.5-115(b)." *Id.* ¶ 41.

¶ 40     We found *Humphrey*, *Rivera*, and *Suggs* to be controlling. *Id.* ¶ 42. Based on these cases and the relevant statutes, we concluded that "the line of adulthood has been drawn at age 21." *Id.* We reach the same result here and decline to depart from our holding in *Green*. Since defendant in this case was 21 years old at the time of the offense, he was an adult for purposes of a *Miller* claim. *Id.*; see also *Humphrey*, 2020 IL App (1st) 172837, ¶ 33; 705 ILCS 405/1-3(2) (West 2018).

¶ 41     Further, defendant's actions in this case involved the planned robbery of Sales that escalated into his kidnapping and murder. Defendant and his codefendants planned to kidnap and rob Sales because they believed Sales carried drugs. They forced Sales into the trunk of Sales's vehicle at gunpoint. They later stopped to take Sales's cell phone because they feared he would call the police. They then drove to an alley, let Sales out of the trunk, and returned his keys. However, when Sales cursed at defendant and demanded his phone, defendant got angry and shot Sales multiple times, resulting in Sales's death. Defendant, along with a codefendant, later burned Sales's vehicle in the parking lot of the Ford City shopping center because they believed their fingerprints were in the vehicle. Defendant's PSI also disclosed that defendant was a member of the Vice Lords gang at the time of the commission of the crime. We also point out that defendant has one prior adult conviction for criminal trespass to a vehicle, for which he received probation that he subsequently violated. As shown, defendant not only participated in the planning and execution of the armed robbery and kidnapping of Sales to obtain drugs, but these offenses escalated to an execution-style murder when Sales angered him and he recalled Sales having stolen money from him. He then attempted to cover up his actions when he lit Sales's car on fire. We find that defendant's actions in the events leading to Sales's murder were not those of a juvenile with poor impulse control.

¶ 42    Finally, even assuming that a 21-year-old defendant could be considered a youthful offender, which we do not find, defendant cannot establish the requisite prejudice for his successive petition because the supporting documents convey the same mitigating evidence presented to the trial court. Here, defendant supported his petition with an affidavit from his mother. She detailed a fall defendant suffered as a small child that resulted in a concussion. Defendant's mother also stated that defendant had a learning disability throughout his school years and that he was prescribed Ritalin. Defendant also attached his requests to Chicago Public Schools and area hospitals seeking records relating to his brain injury and disability, but the records were no longer available.

¶ 43    However, this same evidence was presented at defendant's sentencing hearing. Defendant's mother, as well as his grandmother, testified in mitigation about defendant's childhood, including his prescribed use of Ritalin and placement in special education classes. His grandmother testified that defendant fell from the third floor when he was a baby and that the fall "sort of [took] something away from him." His mother testified that she has multiple sclerosis and defendant was "always there" for her. She also discussed how defendant fell at age two and had a concussion. He was prescribed Ritalin from first grade through high school. Defendant left school his junior year. Thus, the supporting documents presented in this case contain the same information that was before the trial court at defendant's sentencing.

¶ 44    Additionally, defense counsel's argument highlighted defendant's youth and his learning disability.

> "Mr. Hemphill as you can tell from both his mother and grandmother, was a decent kid prior to the time of the commission of this offense.

Mr. Hemphill was not a lad that was always in trouble. Mr. Hemphill is

not a person that society needs to be protected from or needed to be protected

from prior to that date in terms of his general overall conduct.

As you know, Mr. Hemphill has a medical condition. That never was

raised before. And the issue of the concept of his ability to reason appropriately at

the time that incident Mr. Sales lost his life, with respect to what the prosecution

has said, it is our position that these sentences should all be concurrent. And that

we would ask for a minimal sentence in every regard."

¶ 45    In imposing the sentence, the trial court stated that it reviewed defendant's statement "over and over again" and found that defendant's criminal objective "was constantly changing from the time of the armed robbery, which resulted in attempt armed robbery, up until the murder and then the arson." The court then honored the defense counsel's argument and imposed concurrent sentences for the aggravated kidnapping, armed robbery, and attempted armed robbery convictions. The court found that defendant killed Sales with a gun and the evidence showed that Sales received three gunshot wounds. The court further found defendant's statement credible that he was the person who inflicted the gunshots and then sentenced defendant to a term of 40 years.

¶ 46    In its findings, the trial court, as discussed above, specifically referenced defendant's argument and took defendant's age into account and rejected it.

"That's one thing about a murder, Mr. Hemphill. After it's said and done, it's easy

for the person charged with the murder to say he's young and he's stupid and

have mercy. Doesn't bring the victim back. Doesn't bring the victim back at all.

There's nothing that I can give, I'm going to do here today that is going to bring the victim in this case back to his family."

¶ 47    Additionally, the court was presented with mitigating evidence about his character, his brain injury and subsequent learning disability, and his failure to finish high school. The court mentioned the testimony from defendant's mother and grandmother in its findings. Based on the court's findings, including its imposition of concurrent sentences, the record shows that the trial court considered defendant's evidence in mitigation. Therefore, he cannot demonstrate sufficient prejudice that his sentence violated due process because the trial court was presented with the same evidence at issue here. See *Wrice*, 2012 IL 111860, ¶ 48.

¶ 48    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 49    Affirmed.

**No. 1-20-1112**

| | |
|---|---|
| **Cite as:** | *People v. Hemphill*, 2022 IL App (1st) 201112 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 99-CR-12045; the Hon. Thomas J. Hennelly, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Katie Anderson, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, Daniel Piwowarczyk, and Justin Erb, Assistant State's Attorneys, of counsel), for the People. |