2022 IL App (1st) 1210748-U

FIFTH DIVISION
November 18, 2022

No. 1-21-0748

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 00 CR 8715 |
| | ) | |
| KENDALE MCCOY, | ) | Honorable Thomas Joseph Hennelly, |
| | ) | Judge Presiding. |
| Petitioner-Appellant. | ) | |

PRESIDING JUSTICE CONNORS delivered the judgment of the court.
Justices Cunningham and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The circuit court's denial of defendant's motion for leave to file a successive postconviction petition is affirmed, where he cannot establish cause for his claim that his 40-year sentence violated the proportionate penalties clause of the Illinois Constitution.

¶ 2    Defendant, Kendale McCoy, appeals from the circuit court's order that denied him leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2020)). Following a jury trial, McCoy was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2000)) and two counts of armed robbery (720 ILCS 5/18-2(a) (West 2000)). McCoy, who was 20 years old at the time of the offenses, was sentenced to 40 years in prison for first-degree murder and 15 years for each count of armed robbery, to be

served concurrently. On appeal, McCoy contends that the circuit court erred when it denied his motion for leave to file his successive postconviction petition because he established cause and prejudice for his claim that his 40-year sentence is unconstitutional as applied to him, as it was imposed without the trial court's understanding of the lessened culpability and greater rehabilitative potential of youthful offenders. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4         Following a 2001 jury trial, McCoy was found guilty of two counts of armed robbery and one count of first-degree murder. At the time of the offenses, McCoy was 20 years old. The trial court sentenced him to 40 years in prison for first-degree murder and 15 years for each count of armed robbery, to be served concurrently. On direct appeal, this court affirmed the trial court's judgment and set forth a summary of the trial evidence. See *People v. McCoy*, 1-02-0033 (2003) (unpublished order pursuant to Supreme Court Rule 23).

¶ 5         As the trial evidence is not at issue, we summarize and repeat from our prior order those facts necessary to an understanding of the issues raised in this appeal.[1] See *id.* At trial, Theon Dudley Jones testified that on September 13, 1999, he was with Delano Reese at a Chicago Housing Authority (CHA) building visiting a friend. While they were waiting for the elevator, Jones saw McCoy and codefendant, Calvin Clay,[2] enter the building with guns. McCoy and Clay told Jones and Reese to "empty their pockets," and Jones and Reese took paper and money out of their pockets. McCoy pointed his gun and threatened Reese, and Clay walked to the front of the building and looked around to see if anyone was in the area. Clay then walked back inside the building and shot at Reese three times. While Reese was falling down, McCoy

---

[1] McCoy states in his opening brief that the "trial proceedings are not in dispute, and were adequately summarized by this Court on direct appeal. See *People v. McCoy*, No. 1-02-0033 (Apr. 16, 2003)."
[2] Clay and McCoy had separate trials and Clay is not a party to this appeal.

fired his gun at him two times. McCoy and Clay then ran out of the building. Later that day, Jones identified McCoy and Clay in photographs, and about two weeks later he identified McCoy in a police lineup. Lorenzo Thomas testified that he was at the CHA building on September 13, 1999, and heard gunshots, after which he looked out of the window and saw McCoy and Clay run out of the building with guns.

¶ 6        The State presented McCoy's videotaped statement. The Rule 23 order summarized the statement as follows:

> "Defendant stated that Clay gave him a 'long .38 revolver' and he walked with Clay to 2222 South State. Inside the building, Clay told Reese and Jones to empty their pockets and they placed money and papers on the floor. Defendant checked to see if Reese and Jones had any weapons, while Clay looked out the front of the building to see if anyone was nearby. Defendant waved his gun at Reese and Jones, who had their hands above their heads. Clay returned and picked up the money that was on the floor. When defendant turned to leave the building, he heard a gunshot. When he turned back around, defendant saw Clay shoot four or five times at Reese and Reese fall to the ground. Defendant and Clay ran out of the building, and defendant fired his gun three times in the air to make sure that no one was following them."

¶ 7        The jury found McCoy guilty of first-degree murder and two counts of armed robbery.

¶ 8                                Sentencing

Presentence Investigation Report (PSI)

¶ 9        The PSI included information about McCoy's social history, marital status, education, employment, health history, drug and alcohol use, community involvement, and economic status.

3

It provided that McCoy stated, among other things, that his parents never married, and he lived with his mother in Chicago until he was seven years old, at which time he moved to Minnesota to live with his father and stepmother. In 1996, he returned to Chicago to live with his mother. Both of his parents had abused drugs and alcohol. His childhood was "sometimes bad, sometimes good" and he denied any history of child abuse. McCoy attended two elementary schools, one in Chicago and one in Minnesota. He attended middle school in Minnesota and then after one year of high school there, he moved back to Chicago, where he attended some high school. He then moved back to Minnesota and enrolled in another high school before he left school in the eleventh grade. McCoy participated in "special education classes for slower learners" in elementary school and did not participate in any school activities. He failed the GED test but hoped to retake the test.

¶ 10　　　　McCoy supported himself by working "odd jobs." He started experimenting with alcohol and marijuana when he was 14 years old and had on average a half of a pint of hard liquor daily and about two to three "blunts" of marijuana each day. When he was 15 years old, he joined a gang, which he quit when he was arrested for the charges in this case. The PSI provided that McCoy denied any history of mental health or a need for mental health treatment, and he denied any problems with drugs or alcohol. The PSI stated that McCoy did not have any juvenile adjudications and he received a boot camp sentence in 1997 for a drug offense. McCoy had a three-year-old child, whom he saw daily, and did not pay child support.

¶ 11　　　　　　　　　　　　　　Sentencing Hearing

¶ 12　　　　At McCoy's sentencing hearing, the court entered into evidence a certified copy of his conviction for delivery of a controlled substance from 1997. In aggravation, the State read a victim impact statement from the victim's grandfather, in which he stated that the victim "was a

whimpy little guy who was 17 years old," had recently helped his grandfather paint a large apartment, and always washed the dishes for his aunt, brother, and cousins with whom he lived. The State stated that this was a tragic case, there was no provocation, and the unarmed victims were in "the wrong place at the wrong time, being there when the defendant and his buddies decide to go look for rival gangs." The State asserted that McCoy was charged in this case within one year after he was released from a boot camp sentence that he received for a drug conviction. The State requested the court give him an "appropriate sentence."

¶ 13        In mitigation, McCoy's mother, Patricia White, testified that McCoy lived with her until he was eight years old when he moved to Minnesota with his father. He returned to live with White when he was 17 years old. She testified that McCoy was a "good son," a "good kid," and "just hangs with the wrong crowd at times." She moved out of the CHA Harold Ickes building and tried to make a better home for her children. She testified that "I would try to tell my son all the time please, whatever you do stay away from those Ickes, it's going to be the cause of your death and the cause of you going to jail." She testified she tried to teach her son "to do the right things, I raised them in the best way that I can as a parent" and "one time I know he was living with his dad, his dad was on drugs, I don't know what kind of life he led at that time, but when he came back to me, I used to be on drugs." She also testified that McCoy had a son whom she now had to raise.

¶ 14        Defense counsel argued that McCoy attended special education classes, worked odd jobs, and tried to support himself. Counsel stated that McCoy tried to finish high school and get his GED, but was unsuccessful, and this was his first conviction for a violent crime. Counsel noted that the court had read about McCoy's use of drugs and alcohol and heard evidence about the alcohol abuse in the home. Counsel argued that she believed the jury found McCoy guilty

based on an accountability theory while he was armed, that the physical evidence did not support

that he "fired at anyone credible," and that Clay was the person who did the shooting that killed

the victim. Counsel argued that even a 20-year minimum sentence was substantial and requested

a sentence "closer to the minimum than the maximum."

¶ 15      Following counsel's argument, McCoy stated that "[t]here's not a day that goes by

that I don't think of the tragedy that has happened to my life and also Delano Reese's life, both

taken away" and that "[n]ow both of our families has lost two young men." He stated, "I wish I

could take back the hands of time and change that in life."

¶ 16      The trial court sentenced McCoy to 40 years in prison for first-degree murder and 15

years for each armed robbery count, to be served concurrently. In doing so, the trial court stated

that it reviewed its notes from trial, the statutory factors in aggravation and mitigation, the

information contained in the PSI, the victim impact statement, the testimony from McCoy's

mother, the arguments in aggravation and mitigation, and McCoy's statement.

¶ 17      The court discussed the evidence relating to whether McCoy was the shooter who

shot the victim:

> "And, I suppose, addressing one issue that counsel has addressed with regard to the
>
> physical evidence, the testimony with regards to whether the defendant was shooting,
>
> clearly several of the witnesses testified the defendant was shooting as he left the building
>
> into the air in an attempt, I suppose, to scare away some of the potential witnesses, but, of
>
> course, the Court is mindful that Mr. Jones, who came in to testify, did indicate that after
>
> Calvin Clay began shooting and as the victim was falling in this case, that Mr. McCoy
>
> shot two times at him as well as he was falling. Counsel's correct about the physical
>
> evidence that was recovered. Most of the physical evidence recovered in this case would

suggest that Mr. Clay, that at least more accurate in his aim which resulted in the injuries, and that there was instruction with regard to the theory of accountability, reasonable fact-finder could have found either way that the defendant clearly was accountable for the actions, but because there was evidence that he also participated in the shooting that caused the death of Mr. Reese."

The court also noted that McCoy did not have a "significant prior criminal history." The court stated that McCoy had previously received a boot camp sentence and that within one year of being released from boot camp, this offense occurred, the "most serious charge that one human being can be charged with, and that is, I suppose, cold-blooded murder of another individual."

¶ 18    As for mitigation, the court stated:

"I do note in terms of mitigation***as [defense counsel] has argued that with regard to your education***it does indicate that you were in classes for slow learners, and, quite frankly, I probably might have not necessarily, being a slow learner, but from the evidence that was presented and the description of your participation in this particular crime as relayed by other witnesses, it has become clear to this Court that Mr. Clay was clearly more of the motivating force, I suppose, to put it in another way, an inspiration for you to accompany him, to arm yourself, and do the things that resulted in this particular case."

The court stated that "[t]hat is not an excuse" but "offer[ed] some mitigation." the court concluded:

"But there does come a point in your life, and as your mother apparently has repeatedly told you, you're 22 years old, you're a man in the eyes of the law, and you

have to make decisions, and you have to live by the decision you make and consensus [*sic*] to follow."

¶ 19    The court stated that it accepted McCoy's "statement of regret as being a sincere one" and that "it is probably a good thing that you feel that within yourself." The court stated that it indicated to the court that "there is a spark of good in you that if directed and channeled the proper way, that will cause you when you come out of the penitentiary system to be a productive and loving member of your community, church, family and part of your child's life, but those will be things that you will have to decide on your own."

¶ 20    McCoy filed a motion to reconsider sentence, in which he argued, among other things, that the sentence was excessive in view of his background and the nature of his participation in the offense. The court denied the motion to reconsider sentence.

¶ 21                                Direct Appeal

¶ 22    As previously noted, McCoy appealed his conviction and sentence to this court. See *People v. McCoy,* 1-02-0033 (2003) (unpublished order pursuant to Supreme Court Rule 23). On appeal, McCoy argued that the trial court abused its discretion because it imposed an excessive sentence where the "evidence demonstrated a lower level of culpability" and the court did not consider his rehabilitative potential. This court stated that the trial court had rejected McCoy's argument that the physical evidence did not support the determination that he actually shot at the victim, noting that Jones testified that after Clay shot the victim, McCoy fired the gun at him two times. This court also concluded that McCoy's claim that the trial court did not adequately consider the mitigating factors as evidence of his rehabilitative potential was without merit. The court noted that all mitigating factors were presented and given "due consideration" and that the trial court considered the PSI, the testimony by McCoy's mother, and defense counsel's

statements in mitigation. This court also stated that the trial court considered other relevant factors, including the seriousness of the crime and the protection of society. This court affirmed the trial court's judgment.

¶ 23                                Post-Conviction Petitions

¶ 24        In 2004, McCoy filed a petition for postconviction relief under the Act, in which he argued he was denied his constitutional right to counsel while at the police station, he was denied his right to a fair trial and to testify, the State's witnesses committed perjury, his videotaped statement was coerced and should have been suppressed, and his trial counsel provided ineffective assistance of counsel in numerous ways. In a written order, the circuit court denied McCoy's petition for relief and dismissed his petition, concluding that the claims raised were frivolous and patently without merit. On appeal, this court affirmed the circuit court's judgment. See *People v. McCoy*, No. 1-13-1184 (2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (citing *People v. McCoy,* No. 1-04-3320 (2006) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 25        In 2011, McCoy filed a motion for leave to file a successive postconviction petition for relief. He alleged that his due process rights were violated because the State withheld certain evidence, including the criminal histories of the State's witnesses, and that he received ineffective assistance of counsel. The circuit court denied McCoy's motion and then subsequently denied his motion to reconsider. On appeal, this court affirmed the circuit court's judgment. *People v. McCoy*, No. 1-13-1184 (2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 26        In October 2020, McCoy filed the motion for leave to file a successive postconviction petition at issue here. He contended that his sentence violated the eighth amendment to the

United States Constitution and the proportionate penalties clause of the Illinois Constitution. He asserted his 40-year sentence was a *de facto* life sentence and was imposed without adequately considering his youth.

¶ 27    McCoy attached to his petition an affidavit, in which he averred, among other things, as follows. His parents were never married, and he was raised in a small apartment in a CHA building with other relatives. When he was two years old, he observed an argument between his parents where his mother threw his father's belongings out of their apartment, after which his parents' relationship ended. His mother received public aid and relied on free food programs as well as family members and friends for basic essentials. His mother used crack cocaine and when he was eight years old, she tried to commit suicide. Shortly thereafter, one of his cousins, who was like a brother to him, tragically died. As a result, he started acting out and was expelled from school and sent to Minnesota to live with his father. His behavior problems escalated, and he was placed in classes for slow learners until he finished eighth grade. He had to depend on his stepmother to take care of him because his father would go missing for days or sometime weeks "at time out on a bender to his crack cocaine addiction."

¶ 28    McCoy further averred that when he was 13 years old, he started using marijuana and drinking alcohol. When he was 15 years old, his grades were failing due to his low attendance, and he became involved with gangs and drugs. He never saw a psychologist, therapist, or counselor. Between the ages of 13 and 16, he moved back and forth between Chicago and Minnesota and, at age 16, he permanently moved back to Chicago. He attended four high schools until he dropped out in eleventh grade. By the time he was 18 years old, he suffered the tragic deaths of several of his childhood friends. McCoy also stated in his affidavit that during his 21 years of incarceration, he "obtain[ed] educational progress, spiritual development, vocational

development, and psychological maturity." On several different occasions, he was approved by the prison's administration for assignments relating to janitorial, laundry, and food and he has substantial support available for post-release living.

¶ 29    To his petition, McCoy attached a prison disciplinary record as well as various certificates from programs, including programs in lifestyle redirection, anger management, and domestic violence. McCoy also attached to his petition various articles relating to emerging adulthood and criminology, including articles entitled "Emerging Adulthood: A Theory of Development from the Late Teens through the Twenties"; "Emerging Adulthood, a Pre-adult Life-History Stage"; "The Emerging Adult Gap: Integrating Emerging Adulthood into Life-Course Criminology"; and "Less Guilty by Reason of Adolescence."

¶ 30    The circuit court denied McCoy's motion for leave to file a successive postconviction petition. The circuit court subsequently denied his motion to reconsider. This appeal follows.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, McCoy contends that he established cause and prejudice for his claim that his 40-year sentence was unconstitutional as applied to him, as it was imposed without the current understanding of the lessened culpability and greater rehabilitative potential of youthful offenders. He argues he established cause for failing to raise his claim in an earlier petition because the developing case law on juvenile and young-adult offenders, including the United State Supreme Court decision in *Miller v. Alabama*, 576 U.S. 460 (2012), as well as the cases applying *Miller*, were unavailable to him when he filed his initial postconviction petition in 2004. McCoy argues that he established prejudice for his claim because the record shows that the trial court did not consider the *Miller* factors when it imposed his sentence, and his petition as

11

well as supporting affidavit adequately pled that due to his unique circumstances, he was not fully mature when he committed the offenses.

¶ 33                                    Post-Conviction Hearing Act

¶ 34        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)) provides a remedy by which those under criminal sentence can assert that their convictions were the result of a substantial denial of their constitutional rights. *People v. Peacock*, 2022 IL App (1st) 170308-B, ¶ 4. A postconviction proceeding is a collateral attack on a prior conviction and is therefore "limited to constitutional matters that were not and could not have been previously adjudicated." *People v. Morris*, 236 Ill. 2d 345, 354 (2010). Thus, "issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered forfeited." *People v. Davis*, 2014 IL 115595, ¶ 13.

¶ 35        The Act contemplates the filing of only one postconviction petition. *People v. Edwards*, 2012 IL 111711, ¶ 22. As such, "a defendant faces immense procedural default hurdles when bringing a successive postconviction petition" and "these hurdles are lowered only in very limited circumstances." *Davis*, 2014 IL 115595, ¶ 14. A petitioner seeking to file a successive postconviction petition must first obtain leave of court. *Peacock*, 2022 IL App (1st) 170308-B, ¶ 4. For a petitioner to obtain leave of court, he or she "must demonstrate 'cause' for the failure to raise the claim in the initial petition and that 'prejudice' resulted from that failure." *People v. Dorsey*, 2021 IL 123010, ¶ 32. Under the Act, a defendant shows cause by "identifying an objective factor that impeded the ability to raise a specific claim during the initial postconviction proceeding." *Id.* (citing 725 ILCS 5/22-1(f) (West 2020)). A defendant shows prejudice by showing that "the claim not raised during the initial proceeding so infected the trial that the

resulting conviction or sentence violated due process." *Id.* (citing 725 ILCS 5/22-1(f) (West 2020)).

¶ 36        At the leave to file stage, a petitioner "is not required to make the 'substantial showing' that will later be required at a second-stage hearing after counsel is appointed." *People v. Walker,* 2022 IL App (1st) 201151, ¶ 20. Rather, the court should only deny a petitioner leave to file a successive postconviction petition "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith,* 2014 IL 115946, ¶ 35. Our review of a circuit court's denial of leave to file a successive postconviction petition is *de novo. People v. Wimberly*, 2022 IL App (1st) 211464, ¶ 5.

¶ 37        As previously noted, McCoy asserted in his motion for leave to file a successive petition that his sentence violates the eighth amendment to the United States Constitution as well as the proportionate penalties clause of the Illinois Constitution. On appeal, McCoy contends that his 40-year sentence is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution. To support this argument, McCoy relies on *Miller* and the evolving federal and Illinois case law relating to sentencing of juvenile and young-adult offenders. McCoy's claim under the proportionate penalties clause of the Illinois Constitution is based on *Miller*, so we will first briefly address the eighth amendment and *Miller*. See *People v. Walsh*, 2022 IL App (1st) 210786, ¶ 25 (stating that the defendant's claim under the Illinois proportionate penalties clause has "its roots in the eighth amendment to the United States Constitution.").

¶ 38                          Eighth Amendment

¶ 39    "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). In *Miller*, 567 U.S. at 465, the United States Supreme Court found that mandatory life without parole for offenders under 18 years old violated the eighth amendment. The court explained that "children are constitutionally different from adults for purposes of sentencing" and "juveniles have diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at 471. The court recognized several factors regarding significant characteristics of juveniles that a sentencing court must consider in mitigation before imposing a mandatory life sentence on a juvenile. *Miller*, 567 U.S. at 477; see also *People v. Holman*, 2017 IL 120655, ¶ 46.

¶ 40    The Illinois Supreme Court has applied the reasoning and factors of *Miller* to discretionary sentences of life without parole for juvenile defendants (*Holman*, 2017 IL 120655, ¶ 40) as well as "*de facto* life sentences, which it defined as a sentence of over 40 years" (*Walker*, 2022 IL App (1st) 201151, ¶ 23). "To prevail on a claim based on *Miller* and its progeny, a defendant sentenced to an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *People v. Buffer*, 2019 IL 122327, ¶ 27 (citing *Holman*, 2017 IL 120655, ¶ 40). Further, "it is well established that offenders who are 18 years old and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases." *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 38.

¶ 41    Here, we note that McCoy was 20 years old at the time he committed the offenses and, thus, not a juvenile offender. Thus, to the extent defendant is arguing that his sentence

14

violates the eighth amendment to the United States Constitution, since he was 20 years old at the time of the offenses, he cannot avail himself of the eighth amendment. See *People v. Harris*, 2018 IL 121932, ¶ 61 (concluding that "the age of 18 marks the present line between juveniles and adults," and noting that "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected"); see also *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 28 (concluding that "[s]ince defendant was age 19 at the time of his crime, he cannot avail himself of the eighth amendment," noting that "it is clear that the categorical findings made by *Miller* and its progeny under the federal eighth amendment apply only to juveniles").

¶ 42                    Proportionate Penalties Clause of the Illinois Constitution

¶ 43        McCoy contends that he adequately raised a claim that his 40-year sentence for offenses committed when he was 20 years old is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution. As previously noted, McCoy's claim is based on *Miller* and the evolving federal and Illinois law on sentencing of juvenile and young adult offenders. In response, the State argues, among other things, that McCoy cannot establish cause because he had the ability to argue an as-applied proportionate penalties clause claim when he filed his direct appeal in 2002, initial postconviction petition in 2004, and his successive petition in 2011. The State asserts that at the time he filed his earlier petitions, the proportionate penalties clause existed, and it was well established that his youth was relevant at sentencing.

¶ 44        The proportionate penalties clause of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. The proportionate penalties clause prohibits punishments that are "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v.*

15

*Ruddock,* 2022 IL App (1st) 173023, ¶ 70. "[T]he proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties." *People v. Savage*, 2020 IL App (1st) 173135, ¶ 65. Further, "our supreme court has acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes— may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause." *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 87 (citing Ill. Const. 1970, art. I, § 11).

¶ 45    Before the court can reach the merits of a defendant's claim that his or her sentence violates the proportionate penalties clause, a defendant first must establish cause for the failure to raise the claim in the initial petition. *Wimberly*, 2022 IL App (1st) 211464, ¶ 7. Thus, before we can reach the merits of McCoy's claim, we first must determine whether he established cause for his failure to raise the proportionate penalties claim in an earlier petition.

¶ 46    As previously noted, McCoy's claim is based on *Miller* and the sentencing law that continues to develop relating to the developmental and neurological differences between adults and young adult offenders. McCoy argues that he established cause for not raising his claim earlier because *Miller* and its progeny were unavailable when he filed his initial post-conviction petition in 2004. However, in *People v. Dorsey*, 2021 IL 123010, ¶ 74, the Illinois Supreme Court has concluded that "*Miller's* announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." The court further stated: "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller's* unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his

state constitutional law claim, which is insufficient to establish 'cause.' " *Dorsey*, 2021 IL 123010, ¶ 74.

¶ 47     McCoy asserts that the overwhelming balance of authority supports his contention that he established cause to raise his claim based on the proportionate penalties clause in a successive petition because the legal basis and the applicable science were not sufficiently developed when he filed his initial petition. However, this court has concluded that "the possibility of such a claim has since been foreclosed by the supreme court's decision in *Dorsey*." *Wimberly*, 2022 IL App (1st) 211464, ¶ 9; see also *Peacock*, 2022 IL App (1st) 170308-B, ¶ 20 ("Following *Dorsey*, reviewing courts have repeatedly concluded that *Miller* and its progeny do not provide petitioners seeking leave to file successive petitions with the requisite cause for challenging their sentences on proportionate penalties grounds."). In *Peacock*, where the defendant, who was 17 years old at the time of the offense, filed his initial postconviction petition in 2001, this court found he could not establish cause for his claim that his sentence violated the proportionate penalties clause, stating "the idea that sentencing youthful offenders requires consideration of their emotional maturity was recognized in Illinois far before defendant was sentenced and long before he filed his initial postconviction petition." *Id.* ¶ 22. The court concluded: "Although *Miller* and its progeny may provide additional support for a proportionate penalties argument, the emergence of such support for a claim that was already raisable does not constitute cause." *Id.*

¶ 48     Here, following *Dorsey*, McCoy's reliance on *Miller* and the evolving developments in sentencing law relating to juvenile and young adult offenders as the reason for failing to bring his proportionate penalties clause claim in his initial petition is insufficient to establish cause. See *Wimberly*, 2022 IL App (1st) 211464, ¶ 9 ("In light of the court's pronouncement in *Dorsey*,

the defendant's reliance on *Miller* and related developments in juvenile-sentencing case law as the reason for his failure to bring his proportionate-penalties-clause claim in his initial petition is insufficient to establish cause."). Thus, McCoy did not establish cause for his claim that his sentence as applied to him violates the proportionate penalties clause of the Illinois Constitution. Because McCoy must establish both cause and prejudice to file a successive post-conviction petition, the circuit court properly denied him leave to file the successive petition.

¶ 49        Moreover, we note that in *People v. Buffer*, 2019 IL 122327, ¶ 41, our supreme court stated that a "prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." Thus, McCoy's sentence of 40 years as a 20 year old does not constitute a *de facto* life sentence. See *People v. Hemphill*, 2022 IL App (1st) 201112, ¶ 26 ("Since, under *Buffer*, a sentence of 40 years is not a *de facto* life sentence for a juvenile, it follows that defendant's 40-year sentence as a 21-year-old likewise falls outside of *Miller* and its protections.").

¶ 50                                    III. CONCLUSION

¶ 51        For the foregoing reasons, we affirm the circuit court's denial of McCoy's motion for leave to file a successive postconviction petition.

¶ 52        Affirmed.